96 F.3d 1193
 1996-2 Trade Cases P 71,565, Util. L. Rep. P 14,126,
96 Cal. Daily Op. Serv. 6990,
96 Daily Journal D.A.R. 11,521
 CALIFORNIA CNG, INC., a California corporation; California
CNG, a California general partnership; Prime of
California, Inc., a California
corporation, Plaintiffs-Appellants,
v.
SOUTHERN CALIFORNIA GAS COMPANY, a California corporation;
Henderson Engineering Company, an Illinois
corporation, Defendants-Appellees.
 No. 95-55806.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 8, 1996.
Decided Sept. 19, 1996.
As Amended Jan. 30, 1997.
 
 Jonathan M. Gordon, McClintock, Weston, Benshoof, Rochefort, Rubalcava & MacCuish, Los Angeles, California, for plaintiffs-appellants.
 Henry C. Thumann, O'Melveny & Myers, Los Angeles, California, for defendant-appellee Southern California Gas Company.
 Appeal from the United States District Court for the Central District of California, J. Spencer Letts, District Judge, Presiding. D.C. No. CV-95-00281-JSL.
 Before FLETCHER and TASHIMA, Circuit Judges, and RESTANI,* Judge, United States Court of International Trade.
 FLETCHER, Circuit Judge:
 
 
 1
 California CNG, Inc. and Prime of California, Inc., two California corporations (hereinafter collectively referred to as "Cal CNG"), appeal from the district court's dismissal of their complaint alleging various violations of the Sherman Act, 15 U.S.C. §§ 1-7, by Southern California Gas ("SoCalGas"), a California utility company, and by Henderson Engineering, an Illinois corporation. The district court determined that SoCalGas was immune from suit under the "state action" doctrine. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, and we affirm in part and reverse in part.
 
 FACTUAL BACKGROUND
 
 2
 Because the district court dismissed Cal CNG's complaint for failure to state a claim, the allegations of the complaint are taken as true, and construed in the light most favorable to Cal CNG, for purposes of this appeal. National Wildlife Federation v. Espy, 45 F.3d 1337, 1340 (9th Cir.1995). The following recitation of the "facts" therefore draws entirely on the complaint.
 
 
 3
 Cal CNG is involved in the natural-gas-vehicle (NGV) industry. NGVs are internal-combustion-powered vehicles that operate on compressed natural gas, producing a much lower level of emissions than traditional gasoline-fueled vehicles. Concerns about air quality and dependence on foreign oil supplies have heightened interest in NGVs, especially in California. Operators of substantial fleets of vehicles in California have begun using NGVs in their fleets. Fuel for NGVs is dispensed at fueling stations which take natural gas from existing pipelines, compress the gas into storage tanks, and dispense the compressed gas into NGV tanks.
 
 
 4
 The California Public Utilities Commission (CPUC) in January 1992 approved an application by SoCalGas to spend nearly $11 million on a two-year NGV development program, the costs to be recoverable from the utility's ratepayers. That program proposed the installation of fueling stations to serve SoCalGas and customer NGVs. Many of these stations were to be built at the sites of commercial fleet operators.
 
 
 5
 Cal CNG, in mid-1992, together with Prime of California, a corporation with over 30 years experience in building liquid-fuel fueling stations, entered the NGV fueling-station business. Plans called for the company (1) to sell fueling stations and their component parts, including compression equipment; (2) to install and maintain fueling stations on customer property; and (3) to own and operate (or lease) its own fueling stations. Cal CNG entered into negotiations with Henderson, the exclusive U.S. licensee of the Pignone compressor, an Italian-manufactured compressor considered by Cal CNG to be the most technologically superior model available. Cal CNG and Henderson reached a verbal distribution agreement in November 1992, reduced to writing and executed in May 1993, in which Cal CNG obtained the exclusive right to sell Pignone compressors in southern California for an initial term of one year. The agreement set minimum quotas for Cal CNG's sales, and failure to meet the quotas would allow Henderson to terminate the agreement; the quota for the first year was one compressor. Cal CNG then began discussions with southern California's significant vehicle-fleet operators, all of which expressed interest in buying a fueling station from Cal CNG; the company alleges that it would have sold fueling stations to at least some of those operators but for SoCalGas' actions.
 
 
 6
 Those actions, Cal CNG alleges, amounted to a campaign to drive Cal CNG from the market. SoCalGas allegedly approached fleet operators who had expressed interest to Cal CNG and offered them the possession, installation, and maintenance of a complete fueling station, including compressor, for "free, or virtually free". As a consequence, Cal CNG says, several of the operators with which it had held discussions declined to purchase fueling stations from Cal CNG and obtained them from SoCalGas instead. Cal CNG also accuses SoCalGas of other conduct designed to disparage the business and services of Cal CNG, to harass Cal CNG, to dissuade potential customers and investors from further dealings with Cal CNG, and effectively to overpower and destroy Cal CNG in the NGV and NGV fueling-infrastructure markets; Cal CNG, however, does not detail such other conduct. Cal CNG further alleges that when it brought SoCalGas' actions to the attention of legislators and regulators, SoCalGas engaged in further improper conduct, including "direct threats of reprisal to Cal CNG if it did not 'stay away' from So Cal Gas's 'customers' ", disparagement of Cal CNG's equipment and services, and interference with the relationship between Cal CNG and Henderson. As to this last course of conduct, SoCalGas allegedly used economic leverage over Henderson, which was involved in other projects with SoCalGas, to get Henderson to pressure Cal CNG not to compete with SoCalGas and, eventually, to terminate the distribution agreement in May 1994 without justification. All of this conduct, Cal CNG alleges, kept it from selling fueling stations and forced it out of the NGV-infrastructure market.
 
 PROCEDURAL HISTORY
 
 7
 Cal CNG filed a complaint in January 1995 alleging claims against SoCalGas for monopolization and attempted monopolization and against SoCalGas and Henderson for combination and conspiracy to monopolize and to restrain trade, all in violation of sections 1 and 2 of the Sherman Act.[1] SoCalGas and Henderson moved to dismiss the complaint for failure to state a claim, and the court granted the motions. The district court held that SoCalGas' provision to customers of ratepayer-subsidized NGV fueling stations was immune from federal antitrust attack under the "state action" doctrine, that any other conduct by SoCalGas had no "independent competitive impact" that would allow Cal CNG to state a cognizable federal antitrust claim, and that Henderson could not have conspired or combined with SoCalGas to violate the federal antitrust laws because SoCalGas's actions were immunized from federal antitrust scrutiny.[2] Cal CNG has timely appealed.
 
 STANDARD OF REVIEW
 
 8
 A district court's dismissal for failure to state a claim is reviewed de novo. Stone v. Travelers Corp., 58 F.3d 434, 436-37 (9th Cir.1995). A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle her to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957).
 
 DISCUSSION
 I. "State Action" Immunity
 
 9
 The Supreme Court has announced a two-prong test for determining when the state-action doctrine immunizes a defendant's conduct from the antitrust laws: "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself." California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) (citations and internal quotation marks omitted). The Court has held that "state-action immunity is disfavored, much as are repeals by implication". Federal Trade Comm'n v. Ticor Title Ins. Co., 504 U.S. 621, 636, 112 S.Ct. 2169, 2178, 119 L.Ed.2d 410 (1992) (citing Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 398-99, 98 S.Ct. 1123, 1129, 55 L.Ed.2d 364 (1978)).
 
 
 10
 The Ninth Circuit has articulated the application of the first prong of the test to the conduct of private parties that are regulated by state agencies. Columbia Steel Casting Co. v. Portland General Electric Co., 103 F.3d 1446 (9th Cir.1996) (slip op. 1626), Amended Opinion filed December 27, 1996).
 
 A. State Policy
 1. Legislature
 
 11
 California's legislature has clearly articulated and affirmatively expressed a policy of encouraging "substantial market penetration of ... compressed natural gas fueled vehicles" and of encouraging natural-gas utilities "to pursue research, development, and demonstration activities in furtherance of th[at] legislative goal". Cal.Pub.Util.Code § 740.2. As to the specific question of NGV infrastructure, including NGV fueling stations, California's clearest legislative articulation of policy appears in Section 745.5 of the state's Public Utilities Code.[3] In adopting that section, the legislature made the following findings:
 
 
 12
 * that the increased use of natural gas as a transportation fuel is desirable;
 
 
 13
 * that "[a] high quality, reliable, and cost competitive natural gas vehicle ... public fueling infrastructure must be built to sustain a market for natural gas vehicles";
 
 
 14
 * that "[u]tility participation in the construction and operation of compressed natural gas public refueling stations is needed to promote competition with oil companies and others selling compressed natural gas as a vehicle fuel and to help develop a market for natural gas vehicles"; and
 
 
 15
 * that "[t]here are long-term benefits to natural gas utility ratepayers from the sale of natural gas for use as a transportation fuel, and that it should be the policy of the Public Utilities Commission to support utility natural gas vehicle conversion, maintenance, and fueling demonstration programs".
 
 
 16
 1991 Cal.Stat. Ch. 1204, §§ 1(a), (c), (d), (e).
 
 
 17
 The text of the law itself empowered the CPUC to "authorize natural gas utilities to construct and maintain compressed natural gas refueling stations to be owned and operated by the utility, or to be transferred to nonutility operators" and, where appropriate, to "authorize natural gas utilities to recover through rates, either by expensing or capitalizing, or both, the reasonable costs associated with" such fueling-station projects. Cal.Pub.Util.Code § 745.5(a), (d). Section 745.5(e), however, places two limits on the CPUC's power to authorize utilities to engage in fueling-station projects at ratepayer expense. First, the commission cannot allow a utility to pass the costs of fueling stations on to ratepayers unless it finds that the programs "are substantially in the ratepayers' long-term interests". More importantly for purposes of this case, the legislature provided that "[t]he decision of the commission shall also ensure that natural gas utilities do not unfairly compete with nonutility enterprises."
 
 
 18
 We note that § 745.5 appears to articulate a state policy that exhibits considerable tension between two apparently conflicting goals. On the one hand, the legislature wished to "ensure that natural gas utilities do not unfairly compete with" nonutilities in building, maintaining, and operating NGV fueling stations. On the other hand, the legislature allowed utilities, with CPUC approval, to recover the costs of such fueling-station activities through rates charged to utility customers, a resource obviously unavailable to potential nonutility competitors in the NGV-infrastructure market. A number of policies that reconcile these conflicting goals suggest themselves,[4] but what is undeniable is that the legislature intended for the CPUC to perform that reconciliation. Section 745.5 speaks entirely in terms of what the commission may authorize and under what conditions. Specifically, § 745.5(d) allows the commission to authorize recovery of costs through rates, and § 745.5(e) directs the commission, in deciding whether to authorize NGV projects and ratepayer funding for them, to ensure that utilities do not compete unfairly with nonutilities. Thus, it appears that the legislature's clearly articulated policy is to have the CPUC balance the need for utility participation in the development of the NGV-infrastructure market and the need for that market to develop into a competitive one.[5] Therefore, we must look to the CPUC's position to determine whether SoCalGas's conduct is part of a "clearly articulated and affirmatively expressed ... state policy".
 
 2. CPUC[6]
 
 19
 a. 1991-92 Approvals of Utility NGV Programs
 
 
 20
 The first significant CPUC decision to focus on the role of utilities in the NGV market is a July 1991 decision approving an application by Pacific Gas & Electric Company (PG & E) to establish an NGV program. Re Pacific Gas and Elec. Co., 40 C.P.U.C.2d 722, 1991 WL 501752 (Cal.P.U.C.1991) (hereinafter "PG & E "), modified on denial of reh'g, 41 C.P.U.C.2d 428, 1991 WL 552570 (Cal.P.U.C.1991). The PG & E decision is relevant to this case not merely because of the similarity of subject matter but because the commission expressly adopted the policy positions expressed in this opinion when, less than six months later, it approved SoCalGas' application to establish an NGV program. Re Southern California Gas Co., 43 C.P.U.C.2d 104, 110, 1992 WL 584042 (Cal.P.U.C.1992) ("We intend that the policy issues decided in [PG & E ] apply to SoCalGas.").
 
 
 21
 As an initial matter, the commission found that "because of consumer indifference, the low cost of gasoline, the lack of oil company participation, and the lack of financial incentives, the chance of a natural gas fueled vehicle industry surviving and growing without some form of initial public assistance is practically nil." 40 C.P.U.C.2d at 734. The commission approved utility involvement in the NGV market as just the kind of assistance necessary for the industry to survive and grow:
 
 
 22
 In funding the utility for a two-year period we are trying to promote the development of the equipment and infrastructure needed to facilitate the use of natural gas as a vehicle fuel. Utilities play a critical role in the development of this market; but the role, though critical, should be temporary. However, we are not prepared to set a timetable for the extrication of the utilities from the market because it is not clear how long their presence will be needed to provide the bridge to a profitable competitive market for retail CNG.
 
 
 23
 Id. at 742. As the commission put it in a later order on the subject, "[t]he utilities are called upon to 'jump start' the retail market by providing refueling stations and offering conversion incentives". Re Utility Involvement in the Market for Low-Emission Vehicles, Interim Order 91-10-029 (Cal.P.U.C. Oct. 23, 1991), 1991 WL 496693 at * 8. Therefore, the commission approved the utilities' proposals to spend millions of dollars on NGV programs--programs that included the construction of NGV fueling stations--and to charge the costs to ratepayers. PG & E, 40 C.P.U.C.2d at 745 (authorizing PG & E to spend $12,485,000); Re Southern California Gas, 43 C.P.U.C.2d at 113 (authorizing SoCalGas to spend $10,818,000); Re San Diego Gas & Electric Co., 40 C.P.U.C.2d 713, 1991 WL 521000 (Cal.P.U.C.1991) (authorizing SDG & E to spend $6,761,000), modified on denial of reh'g, 41 C.P.U.C.2d 428, 1991 WL 531200 (Cal.P.U.C.1991).
 
 
 24
 In making its decision, the commission expressly considered the possible effects of utility participation in the NGV market on competition:
 
 
 25
 The record is clear, and we find, that PG & E's NGV program is not anticompetitive. There are no competitors now, and potential competitors, if there are any, are waiting for PG & E to show them the way through the investment of PG & E's and ratepayers' funds.... [T]he short answer to [those] who fear competition from PG & E, is that there is no competition. PG & E is in this market by default. No one wants to compete.
 
 
 26
 40 C.P.U.C.2d at 742. Thus, the CPUC reconciled the legislature's two goals of utility participation and fair competition in the NGV-infrastructure market by clearly articulating a policy of allowing ratepayer-funded utility participation in the market because no nonutility enterprises with whom the utilities might unfairly compete were in that market.
 
 
 27
 The commission, however, expressed its intent to monitor closely the impact of utility participation in the market on the growth of competition:
 
 
 28
 As competition in the NGV market emerges and evolves, the Commission will be in a position to adjust the PG & E program, as necessary, in response. PG & E will be subject to ongoing reasonableness reviews. In addition, PG & E's entire NGV program will be subject to review should PG & E apply to continue the program beyond its two-year term. PG & E has also agreed to submit periodic reports to the Commission. The Commission will have ample opportunity to review the competitive situation and make mid-course corrections as necessary.
 
 
 29
 Id. Thus, the CPUC clearly articulated its continuing responsibility for balancing the legislative goals of utility participation in the NGV market and fair competition in that market.
 
 
 30
 b. 1993 Guidelines
 
 
 31
 After approving PG & E's application, the CPUC on its own initiative opened an investigation and rulemaking proceeding concerning utility involvement in the market for low-emission vehicles, including NGVs. Re Utility Involvement in the Market for Low-Emission Vehicles, Interim Order 91-10-029 (Cal.P.U.C. Oct. 23, 1991), 1991 WL 496693.
 
 
 32
 In initiating the proceeding, the CPUC reiterated its view of the role of utilities in the development of an NGV infrastructure: "Initially, the utilities must play a role in ensuring that natural gas is transported to the pumps [and] that there are natural gas refueling stations conveniently located to serve the public ..." Id.
 
 
 33
 at * 5. One purpose of the proceeding was to develop policies on "how long a utility presence will be needed to provide the bridge to a profitable competitive market for retail CNG". Id. at * 7. The proceeding also provided "an opportunity to define more specifically what NGV activities, if any, are appropriate for long-term funding, and what measures the Commission should use to assess possible anti-competitive effects of the utilities' activities". Id. at * 5.
 
 
 34
 Phase I of the investigation and rulemaking concluded with the adoption of policy guidelines by the CPUC in July 1993. Re Utility Involvement in the Market for Low-emission Vehicles, 145 P.U.R.4th 243, 1993 WL 773480 (Cal.P.U.C.1993). While acknowledging that "[i]nvestor owned gas ... utilities have an appropriate and prominent place in seeking to introduce the technology of vehicles ... fueled by compressed natural gas and the development of a service and refueling infrastructure", the commission reiterated that "[t]he activities of such entities are not to be undertaken to the exclusion of other non-utility entrants, and it is the responsibility of the Commission to see that utility presence is compatible with the emergence of competition in all sectors of this industry". Id. at 248. The CPUC therefore adopted the following guideline for its use in the "approval of new and continuing [low-emission-vehicle] programs": "The utility will be required to demonstrate that each element of its [low-emission-vehicle] program is not unfairly competitive with nonutility enterprises, and to discontinue the offending program element if, and when, it interferes with the development of a competitive market." Id. at 252-53.
 
 
 35
 In the guidelines, the CPUC departed significantly from the position that it had taken in its earlier decisions on how to implement the legislative directive to prevent unfair utility competition in the NGV market. No longer was the CPUC willing to say, as it had in PG & E, that utility involvement in the market would have no anti-competitive effect because no competition existed in the market; indeed, it instead made a factual finding that "[t]he preclusion of unfair competition governs markets where there currently is no competition as well as those where there currently is". Id. at 255. Furthermore, in adopting the guideline on competition, the commission stated, "The terms of this guideline supports [sic] and is [sic] obviously subordinate to both state and federal statutes dealing with anti-competitive behavior." Id. at 252. Thus, in July 1993, the commission articulated a new state policy on the balancing of the legislative goals of utility participation and fair competition: even if the NGV-infrastructure market contained no nonutility competitors, the utilities must compete fairly, which meant, at least, conforming to state and federal competition laws.
 
 
 36
 Upon issuing the guidelines, the CPUC announced that the utility NGV programs it had previously approved had to be brought into conformity with the guidelines. Id. at 246. It also ordered the utilities to submit new applications for six-year NGV programs. Id. at 256.
 
 
 37
 c. 1995 Partial Approvals
 
 
 38
 In November 1995, several months after the district court's dismissal of Cal CNG's complaint, the CPUC concluded Phase II of its investigation and rulemaking and issued an order partially approving the applications that the utilities, including SoCalGas, had submitted in response to the issuance of the 1993 guidelines at the completion of Phase I.[7] Re Utility Involvement in the Market for Low-Emission Vehicles, 165 P.U.R.4th 503, 1995 WL 768974 (Cal.P.U.C.1995). SoCalGas's application had included a proposal to use ratepayer funds to construct at least 67 additional NGV fueling stations for the use of its customers. Id. at 545. The CPUC did not approve that portion of SoCalGas's application, finding that the risk that the ratepayers would never recover any of the funds used for such construction was too great. Id. at 545-47. Because the CPUC rejected this portion of SoCalGas's application, it did not fully address the unfair-competition concerns that other parties had raised in the proceeding. The commission did state, however, that "[t]here are many companies that are interested in competing in the market for the construction and operation of refueling stations at customer or other private sites" and that "[a]ny future utility refueling station program must be designed to avoid giving the utility any market advantage, based on its monopoly status". Id. at 547. That meant, the commission concluded, that "construction, operation, and commodity charges must be fully compensatory". Id. In other words, no ratepayer funds could be used to subsidize the utility's costs of fueling stations or the price it charged purchasers of such stations. The legislative goals had been rebalanced again, and state policy had changed as a consequence: the need for fair competition in the NGV-infrastructure market now completely prevented utilities from using ratepayer funds to construct and maintain NGV fueling stations.
 
 
 39
 3. Application to Cal CNG's Claims against SoCalGas
 
 
 40
 Based on the foregoing analysis, it is clear that from July 1991 to July 1993 the CPUC had clearly articulated and affirmatively expressed a state policy that utility activities in the NGV-infrastructure market were desirable and did not pose any dangers to competition because the market contained no competitors. In January 1992, the CPUC approved SoCalGas's application to spend over $10 million of ratepayer funds on NGV programs, including the "install[ation of] up to 51 refueling stations to serve SoCalGas and customer NGVs". 43 C.P.U.C.2d at 111. Thus, any activity by SoCalGas in this period to use ratepayer funds to provide NGV fueling stations to customers below-cost, or even for free, was part of a clearly articulated and affirmatively expressed state policy.
 
 
 41
 In addition, it is equally clear that after November 1995, the CPUC clearly articulated a policy forbidding utilities to use ratepayer funds to compete with nonutilities in the provision of NGV fueling stations. Thus, any SoCalGas actions after November 1995 to provide customers with ratepayer-subsidized NGV fueling stations would not enjoy "state action" immunity from antitrust liability.
 
 
 42
 For the period between July 1993 and November 1995--the period in which most of the SoCalGas actions alleged in the complaint seem to have taken place,[8] the CPUC's articulation of state policy did not directly address NGV fueling stations but held more generally that utilities' NGV programs must not be unfairly competitive with nonutility enterprises and must not interfere with the development of a competitive market. 145 P.U.R.4th at 252-53. The CPUC further stated that its guidelines on utility participation in NGV markets were "subordinate to both state and federal statutes dealing with anticompetitive behavior". Id. at 252. It also directed the utilities to bring their existing NGV programs into conformity with the new guidelines. Id. at 246. Given the guidelines' unequivocal statement that utility activities in NGV markets must not be anticompetitive, the lack of any express commission discussion of fueling stations demonstrates the absence of the "clearly articulated and affirmatively expressed" state policy that Midcal requires to shield ratepayer subsidization of such stations from federal antitrust scrutiny. Therefore, any SoCalGas actions in providing subsidized NGV fueling stations to customers after July 1993 do not enjoy "state action" immunity from antitrust liability.[9][9]
 
 4. SoCalGas' 1994 Tariff
 
 43
 a. 1994 Tariff Filing
 
 
 44
 SoCalGas argues that the structure of its November 1994 rate schedule for natural gas for NGVs constitutes a clear articulation of state policy allowing ratepayer subsidization of utility-built NGV fueling stations. The rate schedule provides that SoCalGas will charge 28.490 cents per therm for uncompressed natural gas to be used at a customer-funded fueling station, where compression "will be performed by the customer using customer's equipment at the customer's designated premises", but will charge 63.683 cents per therm for compressed natural gas dispensed at a utility-funded fueling station, where compression will be performed by the utility. SoCalGas argues in its brief that "[w]hile the [higher] compressed rate supports recovery of part of the capital and operating costs associated with the provision of the fueling station, it purposefully does not provide for full recovery and accordingly results in operator subsidization". Therefore, SoCalGas argues, CPUC approval of the tariff "reflects a conscious state decision to subsidize NGV infrastructure development".
 
 
 45
 The parties dispute whether the district court's judicial notice of the November 1994 rate schedule under Federal Rule of Evidence 201(b) was proper, but we need not resolve the dispute, because even if notice is taken the rate schedule does not establish that SoCalGas is entitled to state-action immunity for three reasons.
 
 
 46
 First, there is no indication on the face of the rate schedule that the compressed-gas tariff, though higher than the uncompressed-gas tariff, is not high enough to provide for full recovery of costs. Therefore, the rate schedule alone does not demonstrate that the CPUC was aware that SoCalGas's tariff structure would result in subsidization such that any commission approval would be a clear articulation of state policy.
 
 
 47
 Second, while SoCalGas argues that the CPUC expressly considered "the structure and substance of SOCAL's NGV tariff", the only support it provides for that argument is citation to the commission's January 1992 approval of SoCalGas's application to use ratepayer funds for its NGV programs. Even if the CPUC did approve the structure and substance of SoCalGas's tariff in 1992, that approval is irrelevant to whether state-action immunity shields the utility from antitrust scrutiny after July 1993, since at that point the CPUC adopted a new state policy on utility participation in the NGV-infrastructure market and expressly ordered that all existing utility NGV programs be brought into conformity with that new policy. In the absence of any evidence that the CPUC actually considered the structure and substance of SoCalGas's tariff after July 1993, the continued existence of the tariff structure approved earlier is insufficient to show a clearly articulated state policy in the later period.
 
 
 48
 Finally, there is no indication that the November 1994 tariff represents any articulation of policy by the CPUC, because it is not clear whether the CPUC actually considered and approved the tariff. According to the SoCalGas cover letter filing the November 1994 adjustments to its rate schedule, the tariffs were adjustments to those first approved by the CPUC as effective on 1 August 1992. The letter states that under the approved rate schedules, the utility is to "redetermine" its rates in the month following the close of each calendar quarter. Whenever the "redetermined" rates vary more than 5% from the then-existing rates, "SoCalGas is to propose the appropriate rate changes and submit them to the Commission three working days before the end of that month" and then "[t]hese newly determined rates are to become effective on and after the first day of the month following their submission". (Emphasis added.) Thus, it appears from the rate schedules themselves that the November 1994 tariff changes simply became effective upon their filing by SoCalGas and the passage of time. There is no indication whatsoever that the CPUC actually examined and approved the tariff structure and these rates in light of its 1993 guidelines such that the tariff could be said to be a clear articulation of state policy. See Phillip Areeda and Donald Turner, Antitrust Law p 213f (1978) ("In one recurrent situation, a regulated firm is obliged by state law to file with a state regulatory agency a tariff stating its rates and practices. Tariff provisions usually take effect unless the agency takes affirmative steps to suspend or disapprove them.... Agency inaction is not sufficient to justify immunity ... [I]t fails to meet the requirement ... that there be a clear state purpose to displace antitrust oversight of this particular activity. Inaction normally does not reflect any agency desire to approve."); cf. Ticor, 504 U.S. at 638, 112 S.Ct. at 2179 (holding as to "actual supervision" prong of Midcal state-action test that "[w]here prices or rates are set as an initial matter by private parties, subject only to a veto if the State chooses to exercise it, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme").
 
 
 49
 On this record, then, SoCalGas has failed to establish that the existence of its November 1994 rate schedules demonstrates a clearly articulated state policy to shield ratepayer subsidization of NGV fueling stations from antitrust scrutiny. The CPUC's 1991 approval of PG & E's NGV program provided that PG & E's tariffs would be reviewed annually, 40 C.P.U.C.2d at 744; while the 1992 approval of SoCalGas's NGV program does not contain the same provision, the fact that the commission expressly incorporated the policy decisions from the PG & E decision in its approval of SoCalGas's program suggests that annual review may have been contemplated for that utility's tariffs as well. Thus, SoCalGas may be able to show sufficient CPUC oversight of its rate structure to meet the first prong of the Midcal test, but it has not done so on this record.
 
 
 50
 b. 1995 CPUC Decision
 
 
 51
 SoCalGas suggests that the discussion of rates in the November 1995 CPUC decision supports its argument that its 1994 rate schedules show that its ratepayer-subsidized NGV fueling stations were part of a clearly articulated state policy.
 
 
 52
 The CPUC indeed points out that SoCalGas's "rate schedules were not designed to cover the total costs of the service" and compares the rates to PG & E's, which "do not recover any portion of [the utility's] capital outlay, maintenance, or fuel taxes in supplying natural gas as a vehicle fuel". 165 P.U.R.4th at 552. The commission then restates the grounds for its approval of this rate structure in PG & E in 1991, including its interpretation of relevant statutory provisions. Id. at 556. However, the commission then notes that it "cannot rest upon this interpretation of the relevant statutes to support the continued offering of subsidized service" because the statutes "must be interpreted in light of [the] guidelines" adopted in 1993. Id. Specifically, the commission points out that ratepayer subsidization in the rates "is unfair competition because of the utilities' ability to rely on captive, regulated customers to provide the subsidy, rather than depend on retained earnings, as would any competitor". Id. The commission then notes that "there are other firms that are interested in competing within and against the compressed natural gas market". Id.
 
 
 53
 While the 1995 decision appears to be the first time that the commission expressly stated that SoCalGas's rate structure for NGV fueling stations was not in compliance with its 1993 guidelines because it allowed the utility to unfairly compete, the 1993 guidelines themselves required the utility to bring its NGV programs into conformity with the guidelines. If SoCalGas failed to do so, then the mere fact that the CPUC did not address that failure until 1995 does not constitute an articulated state policy approving the nonconforming conduct. While the commission in its 1995 decision did not order immediate revisions in the utilities' rates but instead directed the utilities "to file tariffs that will allow for gradual transition from the current rate levels to rates that reflect the direct and fully allocated long-run marginal cost of the service being provided", id. at 557, this alone does not constitute ratification of SoCalGas' rate structure during the July 1993 to November 1995 period because it is not a clear articulation or affirmative expression of state policy to grant immunity to all pre-November 1995 conduct.
 
 5. Conclusion
 
 54
 SoCalGas has, on the record before us, shown a clearly articulated state policy to allow utilities to use ratepayer funds to participate in the NGV-infrastructure market only in the period between July 1991 and July 1993. We therefore reverse the district court's dismissal to the extent that it applies to claims for conduct by SoCalGas after July 1993.
 
 B. Actual Supervision
 
 55
 To qualify for state-action immunity, SoCalGas must show not only a clearly articulated state policy but also the active supervision of that policy by the state. For the period before July 1993, SoCalGas has sufficiently demonstrated such supervision. In January 1992, the CPUC approved a detailed application from SoCalGas to spend over $10 million in ratepayer funds on NGV programs over two years. 43 C.P.U.C.2d at 113. The application had been modified by a settlement agreement between SoCalGas and the Division of Ratepayer Advocates, and the commission modified it further. Id. at 105, 109. Although that approval was ex parte, public hearings had been held on the identical policy issues raised by PG & E's similar application. 40 C.P.U.C.2d at 724. In addition, an ALJ had considered briefs from several parties on the proposed application and settlement agreement. Most importantly, SoCalGas's application proposed "to install up to 51 refueling stations to serve SoCalGas and customer NGVs", 43 C.P.U.C.2d at 111, and the commission's approval of the application authorized SoCalGas to charge the costs of its proposed projects to its ratepayers, id. at 113. Thus, the CPUC expressly approved the conduct challenged by Cal CNG--the use of ratepayer funds by SoCalGas to provide NGV fueling stations to customers at a price below the cost of the stations--between January 1992 and July 1993. We therefore affirm the district court's dismissal to the extent that it applies to claims for actions by SoCalGas before July 1993.
 
 II. Other SoCalGas Conduct
 
 56
 Cal CNG challenges the district court's ruling that, in the absence of an antitrust claim for the provision to customers of ratepayer-subsidized NGV fueling stations, none of the other SoCalGas conduct alleged by Cal CNG--business disparagement, harassment, dissuasion of potential customers and investors, threatening reprisals against Cal CNG, and interference with Cal CNG's relationship with Henderson--had sufficient independent competitive impact to state a federal antitrust claim. Because the district court erred in dismissing Cal CNG's claims based on the ratepayer-subsidized NGV fueling stations, we reverse this subsidiary ruling as to the post-July 1993 period.
 
 III. Henderson[10]
 
 57
 The district court dismissed Cal CNG's claims against Henderson on the ground that Henderson could not have conspired or combined with SoCalGas to violate the antitrust laws because SoCalGas's conduct was immunized by the state-action doctrine. Again, because we reverse the district court's ruling on state-action immunity, we also reverse the dismissal of the claims against Henderson as well.
 
 CONCLUSION
 
 58
 Because California clearly articulated a state policy to shield utility participation in the NGV-infrastructure market from competition only until July 1993, and actively supervised SoCalGas's participation in that market during that period, the district court's dismissal on state-action immunity grounds is reversed to the extent it applies to actions taken by SoCalGas after July 1993.
 
 
 59
 AFFIRMED in part, REVERSED in part, and REMANDED. Each party shall bear its own costs.
 
 
 
 *
 Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 The complaint also included nine state-law claims for restraint of trade, intentional or negligent conspiracy to interfere with prospective economic advantage, unfair business practices, intentional or negligent interference with prospective economic advantage, breach of contract, promise without intent to perform, and negligent misrepresentation
 
 
 [2]
 The district court dismissed Cal CNG's state-law claims without prejudice, and Cal CNG is apparently pursuing those claims in state court
 
 
 [3]
 Section 745.5 is repealed by its own terms, § 745.5(f), on 1 January 1997 unless the legislature acts to extend it
 
 
 [4]
 For example, ratepayer subsidization might be available for the construction of NGV fueling stations but the CPUC could require that revenues from the operation or transfer of the stations be used to "repay" the ratepayers. Or, ratepayer subsidization might be allowed only so long as no nonutility enterprises participated in the NGV-infrastructure market
 
 
 [5]
 This policy is also embodied in § 740.3 of the Public Utilities Code, subsection (a) of which directs the commission to "evaluate and implement policies to promote the development of equipment and infrastructure needed to facilitate the use of ... natural gas to fuel low-emission vehicles". The legislature specifically directed the commission to implement policies on "the rate-basing of ... compressor stations for natural gas fueled vehicles", § 740.3(a)(1), and required that "[t]he commission's policies ... ensure that utilities do not unfairly compete with nonutility enterprises", § 740.3(c)
 
 
 [6]
 We have previously approved the taking of judicial notice under Federal Rule of Evidence 201(b) of published decisions of the CPUC in determining issues of state-action immunity. Nugget Hydroelectric, L.P. v. Pacific Gas and Elec. Co., 981 F.2d 429, 435 (9th Cir.1992), cert. denied, 508 U.S. 908, 113 S.Ct. 2336, 124 L.Ed.2d 247 (1993)
 
 
 [7]
 While the CPUC's November 1995 decision may not directly govern the question of state-action immunity for any of the SoCalGas activity at issue in this appeal, since Cal CNG filed its complaint in January 1995, the ruling is nonetheless useful in assessing California's policy on utility participation in the NGV-infrastructure market in the period leading up to the decision
 
 
 [8]
 The complaint does not specifically allege the dates on which the challenged SoCalGas conduct occurred, but it appears that the conduct alleged must have taken place between May 1993 and January 1995
 
 
 [9]
 Neither party has raised the question of whether the "state action" immunity for SoCalGas's activities extends beyond July 1993 for some "reasonable period" required for the utility to bring its NGV programs into conformity with the guidelines. We therefore need not reach that question on this appeal
 
 
 [10]
 Henderson has not appeared in this appeal and filed no responsive brief to Cal CNG's opening brief